**BURSOR & FISHER, P.A.**
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: idiaz@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646)-837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-mail: scott@drurylegal.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GROW CARE, INC.,<br><br>Defendant. | Case No. 5:24-cv-09122-NW<br><br><u>CLASS ACTION</u><br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jane Doe 1 and Jane Doe 2 ("Plaintiffs") file this class action complaint on behalf of themselves and all others similarly situated (the "Class Members") against Defendant, Grow Care, Inc. ("Defendant" or "Grow Care"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

**NATURE OF THE ACTION**

1. This is a class action lawsuit brought on behalf of all patients who booked or attempted to book an appointment with a therapist on Defendant's mental health platform, Grow Therapy, via its website, growtherapy.com (the "Website"), and answered Defendant's appointment booking intake forms (collectively, "Forms" and each form individually, a "Form").

2. Defendant aids, employs, agrees, and conspires with third parties, Datadog, Inc. ("Datadog"), Twilio, Inc. (Twilio), and Wingify Software Pvt. Ltd. ("Wingify") to intercept patient communications as they fill out the Forms, including communications containing protected medical information. Plaintiffs bring this action for legal and equitable remedies resulting from these illegal actions.

3. This case highlights the real-world barriers to seeking mental health care.

4. Imagine walking into a therapist's office, feeling a blend of hope and vulnerability. You fill out an intake form, honestly stating that you're seeking help for depression. This moment represents a significant step toward healing—a courageous decision to confront your struggles. The journey to get here hasn't been easy; you've navigated numerous barriers, including fear of stigma surrounding treatment, the challenge of opening up to a stranger, and the difficult realization that you need professional help.[1]

[1] Hannah M. C. A. Verhoeven et al., *Understanding the Barriers to Mental Health Care: A Systematic Review of Qualitative Studies*, 10 Healthcare 228 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9690172/pdf/healthcare-10-02228.pdf.

5. Later, you learn that sensitive information about the care you are seeking has been shared beyond the walls of the therapist's office. The very confidentiality you sought has been compromised, leaving you feeling exposed and betrayed.

6. Defendant's conduct does exactly that. By disclosing Plaintiffs' and Class Members' sensitive and confidential Form answers with third parties, Defendant undermined the importance of safeguarding the identities and personal medical information of individuals seeking therapy and has breached its patients' trust.

7. For these reasons, Plaintiffs bring this action for legal and equitable remedies for Defendant's violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; violation of the California Invasion of Privacy Act, Cal. Pen. Code § 631; violation of the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10; Invasion of Privacy under California's Constitution; and Intrusion Upon Seclusion.

**JURISDICTION AND VENUE**

8. The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Nationwide Class and the California Class, and there is minimal diversity.

9. This Court has personal jurisdiction over Defendant because it: (a) purposefully availed itself of the privilege of conducting business in California and/or purposefully directed its activities at the state; (b) the injuries of Plaintiffs and Class Members relate to Defendant's forum-related activities; and (c) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

10. As detailed below, Defendant purposefully, systematically and repeatedly reached into and targeted California in connection with marketing, promoting and otherwise making available the mental health services specifically offered to California residents, including Plaintiffs, via the Website.

11. As a threshold matter, the Court has specific personal jurisdiction over Defendant because it is registered to conduct business in the State of California.

12. The Court also has specific personal jurisdiction over Defendant because Defendant purposefully directed, and continues to direct, its activities at California, and Plaintiffs' injuries arise out of or relate to those contacts.

13. Among Defendant's numerous California contacts, it collected, and continues to collect, Website user activity and geolocation[2] data from Website users residing in California in order to "tailor advertisements and content to increase user engagement" in California. *See Rancourt v. Meredith Corp.*, 2024WL 381344, at *9 (D. Mass. Feb. 1, 2024).

14. Defendant's Privacy Policy confirms that Defendant uses tracking technologies to target its Website users based on their location. Defendant's Privacy Policy[3] states:

> We, and our third-party providers, use tracking technologies to automatically collect usage and device information, such as: … **Information about your location**, such as general geographic location that we or our third-party providers may derive from your IP address.[4]

15. Under Section V of the Privacy Policy, titled "THIRD-PARTY DATA COLLECTION AND ONLINE ADVERTISING," Defendant also admits to using third-party advertising companies to target Website users based on their browsing history and "permit[ting] third-party online advertising networks, social media companies, and other third-party services, to collect information about your use of our online services over time so that they may play or display ads on our Services, on other websites or services you may use, and on other devices you may use."[5]

---

[2] GEOAPIFY, What is Geolocation: How It Works and Its Many Uses, https://www.geoapify.com/what-is-geolocation/ (noting that there are several methods of obtaining a user's geolocation, including obtaining a user's IP address or network location). Upon information and belief, Defendant is using one of these common methods to obtain Website users' location.

[3] *Privacy Policy*, GROW CARE, https://growtherapy.com/_next/static/media/WebsitePrivacyPolicy_20240626.pdf.

[4] *Id.* (emphasis added).

[5] *Id.*

16. Defendant enables the above-described third-party targeted advertising by collecting said information on users' activities:

> through tracking technologies, such as cookies, web beacons, embedded scripts, **location-identifying technologies**, and similar technology, which recognize the device you are using and collect information, including click stream information, browser type, time and date you visited the Sites, AdID, **geolocation**, and other information.[6]

17. In sum, Defendant admits to geolocating its Website users in order to deliver those users with targeted advertising and increase engagement where those users are located. In this case, that includes Defendant's efforts to use third-party services to collect Website usage data of California Website users, to then target those California users with advertisements – thereby increasing Defendant's Website traffic and revenue from Californians.

18. Defendant further admits to geolocating California Website users by providing "CALIFORNIA-SPECIFIC DISCLOSURES" in its Privacy Policy "in compliance with the California Consumer Privacy Act."[7]

19. The "CALIFORNIA-SPECIFIC DISCLOSURES, which specifically pertain to California Website users, state that: (a) "[i]n the last 12 months, we have collected the following categories of personal information: … Geolocation Data, such as your approximate location based upon your IP address"; and (b) "[i]n the last 12 months, we may have disclosed all of the categories of information we collect with third parties[.]"[8]

20. Among other reasons, Plaintiffs' claims arise out of and relate to Defendant's contacts with California because by collecting and disclosing California Website users' data to target California consumers with advertising, Defendant obtains more Website traffic from California, allowing Defendant to further collect and disclose its California Website users' personal subscribers' protected health information and personally identifiable data.

---

[6] *Id.* (emphasis added).

[7] *Id.*

[8] *Id.*

21. Notably, both Plaintiffs have received targeted advertisements from Defendant on social media platforms.

22. Plaintiffs' claims further arise out of and relate to Defendant's contacts with California because, through Defendant's actions, Defendant cultivates an audience in California, which it then exploits by violating the privacy rights of those California residents, including Plaintiffs.

23. Indeed, it was Defendant's actions in California, as alleged herein, that gave rise to the present litigation.

24. Defendant has also purposefully directed its activities at California by operating and designing its Website with the intent to cultivate an audience and obtain patients in California, as evidenced by its Website content with a California-specific focus.

25. For instance, by contracting with California-licensed mental health providers, including providers located in California in order to provide California residents (such as Plaintiffs) with therapy services in California, and by allowing Website users to connect with these California-based and licensed providers via the Website, Defendant's Website exhibits Defendant's intent and active effort to cultivate an audience and obtain patients in California.

26. Specifically, when a patient uses Defendant's Website and goes through the process of booking a therapy appointment, the patient must choose which state they are located in.

27. One of the states that Defendant provides as an option is California.

28. Because Defendant has chosen to provide California as an option and has chosen to contract with California-licensed mental health providers, including providers located in California, Defendant makes it possible for California residents to obtain telehealth services via Defendant. Without Defendant's actions, California residents, such as Plaintiffs, would be unable to use Defendant's therapy services.

29. This is because, under California law, patients using telehealth services – such as those Defendant provides and that Plaintiffs used via the Website – cannot obtain telehealth care from providers not licensed in California.

30. As required by the California Code of Regulations, 16 CCR § 1815.5, "(a) All persons engaging in the practice of marriage and family therapy, educational psychology, clinical social work, or professional clinical counseling via telehealth, as defined in Section 2290.5 of the Code, with a client who is physically located in this State must have a valid and current license or registration issued by the Board."[9]

31. This same requirement applies to psychologists[10] providing services via Defendant's Website.

32. Therefore, without Defendant purposefully directing its activities at California by contracting with California mental health providers, including providers located in California, and without Defendant making California telehealth services available via the Website, Defendant would be unable to tap into the California online mental health care market and have patients, like Plaintiffs, use its services. In other words, Defendant's actions exhibit Defendant's intent to cultivate an audience and obtain patients in California by directing its activities at California.

33. Similarly, these same activities engaged in by Defendant also mean that the Website has a California-specific focus and is directly targeted at California because California residents are able to obtain mental health services via the Website. Absent Defendant purposefully directing its activities at California, California residents in need of mental health services would not be able to obtain that care via Defendant's Website.

34. Plaintiffs' claims arise out of and are related to Defendant's contacts with California because had Defendant not contracted with California-licensed providers and added the option to book with California providers on the Website, Plaintiffs, both California residents who used Defendants' services while in California, would not have been able to book appointments via the Website and would not have had their protected health information and personally identifiable information disclosed to third parties.

---

[9] The Board referred to in this section is California's Board of Behavioral Sciences. https://www.bbs.ca.gov/.

[10] *Notice to California Consumers Regarding the Electronic Delivery of Psychological Services*, DEPARTMENT OF CONSUMER AFFAIRS BOARD OF PSYCHOLOGY, https://www.psychology.ca.gov/consumers/internet_thrpy.shtml.

35. Plaintiffs' claims also arise out of and are related to Defendant's contacts with California given that Defendant has cultivated a market and obtained patients in California, and there is a strong relationship between the privacy violations Plaintiffs suffered, Defendants' actions of cultivating a market in California, and Defendant's data sharing practices that allow Defendant to continue to obtain more patients from California.

36. Additionally, through its California-directed activities, as alleged herein, Defendant obtains substantial interest and traffic from California residents.

37. "Google Trends analyses [sic] a sample of Google web searches to determine how many searches were done over a certain period of time" and can also be tailored to view how much a specified term was searched by location and time.[11]

38. Google Trends assigns a value to locations to signal how much a specified term was searched by location. That value goes from 0-100. As shown in the screenshot below, Google Trends explains:




[11] Google Trends, https://newsinitiative.withgoogle.com/resources/trainings/google-trends-understanding-the-data/#:~:text=A%20value%20of%20100%20is,done%20on%20Google%20close%20check.

39. When reviewing Google's data on the searches for the company "Grow Therapy" (Defendant) for the period of March 2024 to March 2025, California's interest value is 61. Further, only the top nine states, including California, have values higher than fifty, while the rest of the states have values under fifty.[12]

40. These values show that California residents have shown a high interest in searching for "Grow Therapy" and, correspondingly, likely use Defendant's Website at a higher rate as compared to most other states in the country.

41. Finally, Defendant shows its knowledge of its large California consumer base because it also includes privacy disclosures specific to California users, as described above, and complies with California law in making these disclosures.[13]

42. Accordingly, this Court has specific personal jurisdiction over Defendant.

43. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## THE PARTIES

***Plaintiffs***

44. Plaintiff Jane Doe 1 is an adult citizen of the State of California and is domiciled in Campbell, California.

45. Plaintiff Doe 1 has used Defendant's therapy service via the Website since approximately January 2024. Plaintiff Doe 1 began using Defendant's therapy service to obtain mental health care with a therapist to address her anxiety and depression. Plaintiff Doe 1 booked various therapist appointments via the Website to address these mental health concerns. In the process of signing up to obtain mental health care via the Website, Plaintiff Doe 1 filled out the Forms where she communicated with Defendant that she was seeking a therapist that specialized in providing care for anxiety and depression, the name of her medical insurance provider, her medical insurance member identification (ID) number, full legal name, phone number, and email address.

[12] *See* Exhibit 1.

[13] *Privacy Policy*, GROW CARE, https://growtherapy.com/_next/static/media/WebsitePrivacyPolicy_20240626.pdf.

Plaintiff Doe 1 provided this sensitive information with the understanding that it would be reviewed by a therapist in connection with providing her with mental health treatment.

46. Because Defendant integrated and embedded Datadog's, Twilio's, and Winfify's software into the Website, Defendant aided these third parties in unlawfully intercepting Plaintiff Doe 1's medical information in transit, including information regarding the type of mental health treatment she was seeking, along with her personally identifiable information such as her insurance member ID number, full legal name, phone number, and email address. As a result of Defendant's unlawful conduct, Plaintiff Doe 1 received digital advertisements related to Grow Therapy on social media platforms.

47. By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff Doe 1's personally identifiable information ("PII") and protected health information ("PHI").

48. Plaintiff Jane Doe 2 is an adult citizen of the State of California and is domiciled in Roseville, California.

49. Plaintiff Doe 2 has used Defendant's therapy service via the Website since April 2024. Plaintiff Doe 2 began using Defendant's therapy service to obtain mental health care with a therapist to address her anxiety and depression. Plaintiff Doe 2 booked various therapist appointments via the Website to address these mental health concerns. In the process of signing up to obtain mental health care via the Website, Plaintiff Doe 2 filled out the Forms where she communicated with Defendant that she was seeking a therapist that specialized in providing care for anxiety and depression, the name of her medical insurance provider, her medical insurance member ID number, full legal name, phone number, and email address. Plaintiff Doe 2 provided this sensitive information with the understanding that it would be reviewed by a therapist in connection with providing her with mental health treatment.

50. Because Defendant integrated and embedded Datadog's, Twilio's, and Wingify's software into the Website, Defendant aided these third parties in unlawfully intercepting Plaintiff Doe 2's medical information in transit, including information regarding the type of mental health

treatment she was seeking, along with her personally identifiable information such as her insurance member ID number, full legal name, phone number, and email address. As a result of Defendant's unlawful conduct, Plaintiff Doe 2 received digital advertisements for Grow Therapy on social media platforms.

51. By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff Doe 2's PII and PHI.

***Defendant***

52. Grow Care, Inc. is incorporated in the State of Delaware and has its principal place of business in New York, New York. Grow Care provides a mental health services platform via its Website that allows patients to book appointments with therapists.[14]

## FACTUAL ALLEGATIONS

### A. Background of the California Invasion of Privacy Act

53. The California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

54. To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of

[14] GROW THERAPY, *About Us*, https://growtherapy.com/about-us/.

> any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

55. Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

56. Under Cal. Penal Code § 637.2, Plaintiffs and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

### B. Background of the California Confidentiality of Medical Information Act

57. Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), "A provider of health care … shall not disclose medical information regarding a patient of the provider of health care … without first obtaining an authorization, except as provided in subdivision (b) or (c)." Cal. Civ. Code § 56.10(a).[15] "An authorization for the release of medical information … shall be valid if it:

---

[15] Subdivisions (b) and (c) are not relevant to this case but permit the disclosure of medical information in situations where a government investigation or lawsuit is taking place. For example, Defendant could bypass the authorization requirement if patient medical information was requested pursuant to a lawful court order or by a party to a proceeding before a court or administrative agency pursuant to a subpoena. *See* Cal. Civ. Code §§ 56.10(b)(3) and 56.10(b)(6).

> (a) Is handwritten by the person who signs it or is in a typeface no smaller than 14-point type.
>
> (b) Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization.
>
> (c) Is signed and dated …
>
> (d) States the specific uses and limitations on the types of medical information to be disclosed.
>
> (e) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.
>
> (f) States the name or functions of the persons or entities authorized to receive the medical information.
>
> (g) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.
>
> (h) States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information.
>
> (i) Advises the person signing the authorization of the right to receive a copy of the authorization.

Cal. Civ. Code § 56.11.

58. Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' personally identifiable information and protected health information. Cal. Civ. Code § 56.36(c).[16] Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages. Cal. Civ. Code § 56.36(b).

[16] "Every provider of health care ... who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." (§ 56.101, subd. (a).)

59. "In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: [¶] (1) ... nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages. [¶] (2) The amount of actual damages, if any, sustained by the patient." *Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1551, 174 Cal. Rptr. 3d 653, 656 (2014) (quoting Cal. Civ. Code § 56.36(b)).

**C. Defendant's Website**

60. Grow Care provides a mental health care platform, Grow Therapy, accessible via its Website, growtherapy.com. Through the Website, Defendant provides patients with a platform to manage their mental health care by providing patients with therapist options and allowing patients to book appointments with therapists via the Website.[17]

61. Defendant has purposefully integrated and embedded Datadog's, Twilio's, and Wingify's software into its Website to track patients' actions on the Website. Through this action, Defendant has aided Datadog, Twilio, and Wingify in intercepting the PHI and PII of Defendant's patients. The following describes the way in which the Datadog, Twilio, and Wingify software operates and intercepts patient communications on the Website. Plaintiffs' and Class Members' communications were intercepted by Datadog, Twilio, and Wingify in the same manner described below.

**D. Datadog Real User Monitoring**

62. Datadog operates a SaaS called "Real User Monitoring" ("RUM"), which provides marketing and analytics to websites.[18]

63. When installed on a website, RUM "[a]utomatically collect[s] … every … action during a user's session."[19] RUM does this by collecting user "attributes like user ID, email, and

[17] GROW THERAPY, *About Us*, https://growtherapy.com/about-us/.

[18] DATADOG, *Real User Monitoring*, https://www.datadoghq.com/product/real-user-monitoring/.

[19] *Id.*

name" and "actions such as checkout button click, tap, and more" in order to create "custom metrics that are specific to [a] business and correlate them with real-time product analytics."[20]

64. RUM operates a standalone pixel on a website and collects the information described above and transfers it to Datadog in real time.

65. RUM is equipped with an additional feature, also installed on the Website, called "Session Replay," which purports to help businesses improve their website design and customer experience.

66. Session Replay creates a "video-like reproduction of the entire user journey" from the moment a user lands on the webpage.[21]

67. The RUM Session Replay relies on recording every second of a user's interactions with a website, allowing Datadog to "view exactly how your users interact with [a] website."[22] This data is then analyzed and used to make a video that is an exact replica of each user's interaction with the website.[23]

68. Technology like the RUM Session Replay feature is not only highly intrusive, but dangerous. A 2017 study by Princeton University found that session recording technologies were collecting sensitive user information such as passwords and credit card numbers.[24] The research notes that this wasn't simply the result of a bug, but rather insecure practices.[25] Thus, session recording technologies, such as Datadog's, leave users vulnerable to data leaks and the harm resulting therefrom.

---

[20] *Id.*

[21] DATADOG, *Use Datadog Session Replay to view real-time user journeys*, https://www.datadoghq.com/blog/session-replay-datadog/.

[22] *Id.*

[23] *Id.*

[24] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-reply scripts*, (Nov. 15, 2017) https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

[25] *Id.*

69. Datadog itself notes a challenge with using session replay software is that "[i]t can be difficult to capture only the data you need … while still excluding any sensitive user information."[26]

70. Datadog's business model involves entering into voluntary partnerships with various companies and using RUM to surveil communications on their partners' websites.

71. Thus, through websites that employ Datadog's services, such as Defendant's Website, Datadog directly receives the recording of each website visit, including the electronic communications website visitors entered into search bars, chat boxes, and online quizzes, in real time.

72. Because Defendant utilizes Datadog's Session Replay service, Datadog's embedded JavaScript code operates within users' browsers, tracking their interactions (*e.g.*, clicks, scrolls, typing, and other input data) on the website within which the code is embedded without the users' knowledge and transmitting the information to Datadog's servers, along with additional context about the session. In this manner, Datadog effectively obtains a recorded replay of the users' experiences on the site. The data transmission described herein occurs concurrently with each user's activity, enabling Datadog to intercept sensitive data as it is generated. In other words, Datadog's interception of users' communications on the Website occurs "in transit."

73. When integrated and embedded into a website, RUM is not akin to a tape recorder or a "tool" used by one party to simply record the other. Instead, it involves Datadog, a separate and distinct third-party entity from the parties in the conversation, using the RUM Session Replay to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because Datadog itself is collecting the content of any conversation. That information is then analyzed by Datadog before being provided to any entity that was a party to the conversation (like Defendant).

---

[26] DATADOG Knowledge Center, *Session Replay Overview*, https://www.datadoghq.com/knowledge-center/session-replay/.

74. Once Datadog intercepts communications from a website, it has the ability to use such information for its own purposes. Datadog's service agreement with customers like Defendant gives Datadog license to use customer data including "without limitation to develop and improve Datadog products and services and to create and distribute insights, reports and other materials."[27]

75. Datadog's SaaS services are based on its ability to collect and analyze consumer's web behavior and deliver that data to present and future customers, who use that data for targeted advertising and product optimization.

76. Information from websites, like Defendant's Website, is central to Datadog's ability to successfully market its advertising capabilities to future clients.

77. In sum, Datadog has the capability to use website communications to: (1) improve its own products and services; (2) develop new products and services; and (3) analyze website visitors' communications to assist with data analytics and targeted advertising.

**E. Twilio's Segment API**

78. Twilio is "a customer engagement platform used by hundreds of thousands of businesses and more than ten million developers worldwide to build unique, personalized experiences for their customers."[28]

79. Twilio powers this platform through its Segment API, which offers "best-in-class customer data infrastructure, so [developers] can easily unlock real-time intelligence and create personalized, impactful omni-channel campaigns in a snap."[29] In particular, once integrated into a developer's website, the Segment API provides Twilio's platform with "customer identification

---

[27] DATADOG, *Master Subscription Agreement*, https://www.datadoghq.com/legal/msa/#access-and-use.

[28] *What is Twilio? An introduction to the leading customer engagement platform*, TWILIO, https://www.twilio.com/en-us/resource-center/what-is-twilio-an-introduction-to-the-leading-customer-engagement-platform.

[29] *Why Twilio Segment*, TWILIO SEGMENT, https://segment.com/twilio/.

and segmentation,"[30] and it does this by "collecting and connecting data from other tools and aggregating the data to monitor performance, inform decision-making processes, and create uniquely customized user experiences."[31]

80. Grow Care utilizes the Segment API on its Website and enables Twilio to intercept patients' sensitive communications through the Segment API in order to assist with and amplify Grow Care's marketing, advertising, and analytics efforts.

81. Twilio entices developers to integrate the Segment API by underscoring its signature feature: "Engage." Formerly known as Personas, Engage is a "customizable personalization platform with which you can build, enrich, and activate Audiences."[32] Included in Engage are "unified customer profiles" which the Segment API creates by "tak[ing] event data from across devices and channels and intelligently merg[ing] it into complete user- or account-level profiles."[33]

82. Twilio builds these personas through "Segment Identity Resolution."[34] This process "merges the complete history of each customer into a single profile, no matter where they interact with your business."[35] The Segment Identity Resolution supports, among other identifiers, "cookie IDs, device IDs, emails, and custom external IDs," helping Twilio capture "a user's interaction across web, mobile, server and third-party partner touch-points in real-time[.]"[36] The Segment Identity Resolution then combines these "multiple external IDs," into "one persistent ID," culminating in its offered Persona.[37]

---

[30] Ingrid Lunden, *Twilio Confirms It Is Buying Segment For $3.2b In An All-Stock Deal*, TECHCRUNCH (Oct. 12, 2020), https://techcrunch.com/2020/10/12/twilio-confirms-it-is-buyingsegment-for-3-2b-in-an-all-stock-deal/.

[31] Indicative Team, *Segment.io Defined*, MPARTICLE ANALYTICS, https://www.indicative.com/resource/segment-io/.

[32] *Documentation*, SEGMENT, https://segment.com/docs/engage/.

[33] *Id.*

[34] *Id.*

[35] *Identity Resolution Overview*, SEGMENT https://segment.com/docs/unify/identity-resolution/.

[36] *Id.*

[37] *Id.*

83. Twilio leverages these profiles to assist its customers, like Grow Care, to enhance their marketing, advertising, and analytics efforts.

84. Defendant aids Twilio to intercepting users' sensitive communications with Grow Care through the Segment API so Twilio can better target its marketing campaigns. Grow Care does this through Twilio's "Audience" feature, which "group[s] users or accounts based on event behavior and traits that Segment tracks."[38] In other words, the Audience feature allows for targeted marketing of advertisements at Engage profiles that fit specific parameters. As explained below, Grow Care builds these marketing campaigns through Twilio's analytics services.

85. Subsequently, Twilio compiles and transmits that information to other third parties that Defendant utilizes for targeted advertising.[39] Twilio labels these companies "Segment Destinations," which are tools that businesses use for personalization and marketing.[40] In this role, Twilio acts as a facilitator, compiling user data so developers can "personalize messages across channels, optimize ad spend, and improve targeting."[41]

86. When Twilio transmits users' data to Meta Platforms, Inc. ("Meta"), for example, it sends "an expanded list of identifiers or traits to [Meta], so that [Meta] can try to use these additional datapoints to match to their user profiles."[42]

87. The same applies to Google, LLC ("Google"). Twilio "can send audiences created in Engage to Google Ads as a Customer List … Segment sends an initial user list of users to the Google Ads API. As users move in and out of the audience, Segment automatically updates the list in Google. This allows [Twilio's customers] to run advertising campaigns without having to

---

[38] *Engage Audiences Overview*, SEGMENT, https://segment.com/docs/engage/audiences/.

[39] *Using Engage Data*, SEGMENT, https://segment.com/docs/engage/using-engage-data/ (these third parties include Facebook, Google, and Salesforce).

[40] *Id.*

[41] *Id.*

[42] *Facebook Custom Audiences Destination,* SEGMENT, https://segment.com/docs/connections/destinations/catalog/personas-facebook-custom-audiences/.

manually update the list of users to target in [their] Google Ads campaigns."[43] Twilio customers can "send either an email address or mobile device ID (IDFA) from Engage to Google as custom matchers."[44]

88. Twilio describes the above process as "building an Audience," meaning it "group[s] users or accounts based on event behavior and traits that Segment tracks."[45] As an example, Twilio lets developers "create[e] an 'inactive accounts' audience that lists paid accounts with no logins in 60 days."[46] After, "developers can push the audience to your marketing and analytics tools."[47]

89. This process operates within users' browsers, tracking their interactions (*e.g.*, clicks, scrolls, typing, and other input data) on the website within which the Segment API is installed without the users' knowledge and transmitting the information to Twilio's servers. This transmission occurs concurrently with the users' activity, enabling Twilio to collect sensitive data as it is generated. In other words, Twilio's interception of users' communications on the website, including Defendant's Website, occurs "in transit."

90. When integrated and embedded into a website, Twilio's software is not akin to a tape recorder or a "tool" used by one party to simply record the other. Instead, it involves Twilio a separate and distinct third-party entity from the parties in the conversation, using software to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because Twilio itself is collecting the content of any conversation. That information is then analyzed by Twilio before being provided to any entity that was a party to the conversation (like Defendant).

---

[43] *Google Ads Remarketing Lists Destination*, SEGMENT https://segment.com/docs/connections/destinations/catalog/adwords-remarketing-lists/#:~:text=As%20users%20move%20in%20and,in%20your%20Google%20Ads%20campaigns.

[44] *Id.*

[45] *Engage Audiences Overview,* SEGMENT, https://segment.com/docs/engage/audiences/.

[46] *Documentation*, SEGMENT, https://segment.com/docs/engage/.

[47] *Id.*

91. In short, Grow Care utilizes the Segment API to analyze user data, launch marketing campaigns, and target specific users or specific groups of users for advertisements. In this case, the data used was information about Plaintiffs' and Class Members' medical conditions and treatment.

**F. Wingify's Platform and Its Business Tools**

92. Wingify is a marketing platform company that provides website owners with various solutions, through its product VWO, such as website visitor personalization and behavior analytics.

93. Wingify's services operate on a website by having the website owner install Wingify's JavaScript code snippet onto its website.[48]

94. To provide website personalization, Wingify compiles and uses data of website visitors' behavior on a website to "craft and release personalized experiences for them."[49] Website visitors' behavioral data includes "website engagement or browsing behavior data" that is captured and collected "[a]s visitors navigate through your site … in the form of events."[50] Each user experience that Wingify creates using the users' behavioral data, known as an "experience campaign," is triggered based on "visitors' persona or events like when one refreshes a page, when they've scrolled a certain depth, to the time they've spent on a page, among others."[51]

95. Website owners can also create audience segments based on the data collected to then prompt those segments or "personas" with "particular experiences to build personalized journeys."[52]

---

[48] Wingify, *Before you get started with VWO,* https://help.vwo.com/hc/en-us/articles/360019588853-Before-you-get-started-with-VWO.

[49] Wingify, *Personalization*, https://vwo.com/personalization/.

[50] *Id.*

[51] *Id.*

[52] *Id.*

96. Wingify's visitor behavior analysis service involves six different "features" to help its customers "conduct a 360-degree qualitative analysis for endless optimization ideas."[53] Some of those features include session replay services, heatmaps, and user segments. [54]

97. Wingify's session replay software allows Wingify's consumers to "record [their] visitor interactions with [their] website and replay them in a form of a video. These recordings show how users interact with [their] website, by capturing their mouse movements, scrolls, and clicks."[55]

98. Website owners, such as Defendant, can then analyze the session recordings to "[d]ecipher user engagement patterns" or review the generated "event list" cataloging users' actions on the website based on specific events.[56]

99. Because Wingify's session replay captures all user behavior on a website, Wingify allows its customers to "[e]nable safety" features that "[a]utomatically hide personal identifiable info."[57] Even so, Defendant did not enable this feature given that Wingify is able to collect Defendant's patients' PII as shown below.

100. Wingify's business model involves entering into voluntary partnerships with various companies and surveilling communications on its partners' websites with its software.

101. Thus, through websites that employ Wingify's services, such as Defendant's Website, Wingify directly receives the recording of each website visit, including electronic communications of website visitors entered into search bars, chat boxes, and online quizzes, in real time.

102. Because Defendant utilizes Wingify's service, Wingify's embedded JavaScript code operates within users' browsers, tracking the users' interactions (*e.g.*, clicks, scrolls, typing, and

[53] Wingify, *Behavior Analytics*, https://vwo.com/insights/.

[54] *Id.*

[55] Vaibhav Singh, *What are Session Recordings in VWO?*, VWO, https://help.vwo.com/hc/en-us/articles/360019732913-What-are-Session-Recordings-in-VWO.

[56] Wingify, *Session Recordings*, https://vwo.com/insights/session-recordings/.

[57] *Id.*

other input data) on the website within which the code is embedded without the users' knowledge and transmitting the information to Wingify's servers. In this manner, Wingify effectively obtains a recorded replay of the users' experiences on the site. The data transmission described herein occurs concurrently with each user's activity, enabling Wingify to intercept sensitive data as it is generated. In other words, Wingify's interception of users' communications on the Website occurs "in transit."

103. When integrated and embedded into a website, Wingify's software is not akin to a tape recorder or a "tool" used by one party to simply record the other. Instead, it involves Wingify, a separate and distinct third-party entity from the parties in the conversation, using software to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because Wingify itself is collecting the content of any conversation. That information is then analyzed by Wingify before being provided to any entity that was a party to the conversation (like Defendant).

104. Wingify's services are based on its ability to collect and analyze consumer's web behavior and deliver that data to present and future customers, who use that data for targeted advertising, product optimization, and ultimately, monetization.

105. Information from websites, like Defendant's Website, is central to Wingify's ability to successfully market their advertising capabilities to future clients.

### G. How Defendant Disclosed Plaintiffs' and Class Members' Protected Health Information and Assisted With Intercepting Communications

106. Through the software of Datadog, Twilio, and Wingify, Defendant aided Datadog, Twilio, and Wingify with intercepting Plaintiffs' and Class Members' identities and medical information, including information related to the type of medical treatment they were seeking and for which they booked therapist appointments.

107. The following illustrates how Datadog, Twilio, and Wingify intercept Website users' communications. These illustrations are also representative of how Defendant aided Datadog, Twilio, and Wingify in intercepting Plaintiffs' and Class Members' communications.

108. When a patient enters Defendant's Website, the landing page provides patients with a button to "Find a therapist." *See* Figure 1.

**Figure 1**




109. When a patient clicks the "Find a therapist" button, the Website directs them to a web page where they can input specific information about: (1) which state the patient is looking for a therapist in; (2) the patient's medical insurance carrier; and (3) the specific mental health need the therapist specializes in (or in other words, the type of mental health concern the patient is seeking help from a therapist to treat. *See* Figure 2.

**Figure 2**




110. The fields in this Form where a patient must provide their state, health insurance carrier, and mental health needs are all drop down menus that allow a patient to communicate specific information that pertains to their situation. For example, Figure 3 below demonstrates that a patient is given multiple options of various kinds of mental health concerns to choose from. That includes mental health concerns such as addiction, anger management, anxiety, bipolar disorder, and many others. *See* Figure 3. The same applies to the other fields on this Form.

**Figure 3**



111. After a patient inputs information about which state they want the therapist to be in, their medical insurance carrier, and mental health needs, and after they click the "Search" button, the patient is provided with a list of therapists who meet the criteria the patient specified and with whom the patient may book an appointment. *See* Figure 4.

**Figure 4**




112. After choosing a therapist, the patient is able to select an appointment booking date and time with that therapist. *See* Figure 5.

**Figure 5**



113. After clicking "Book now" the patient is directed to a webpage containing another Form where the patient is instructed to provide further information before completing the appointment booking. This Form includes numerous fields where the patient must provide further information, such as their insurance member ID number, their full legal name, phone number, and their email address. *See* Figures 6-7.

**Figure 6**




**Figure 7**



114. Datadog intercepts the following patient communications that the patient inputs into the appointment booking process Forms concurrently with the communications being transmitted to Defendant: (1) the patient's state; (2) the patient's medical insurance carrier; (3) the name of the therapist the patient is booking an appointment with; (4) the type of specialty care the patient is seeking care for; (5) the type of care the patient is seeking (*e.g.,* talk therapy); (6) and whether the appointment will be virtual or in person. *See* Figure 8. In the example below, that information is the following; (1) state: California; (2) medical insurance carrier: United Healthcare Optum; (3) therapist name: Angelita Casares; (4) type of specialty care: anxiety; (5) type of care: talk therapy; and (6) type of appointment: virtual. *See id.*

**Figure 8**


e},"view":{"id":"45c45b24-ee1c-4dcc-a86c-5c12f69ab868","url":"https://growtherapy.com/provider/081675x9g64k/angel
ta-casares?state=California&insuranceType=UnitedHealthcare%2FOptum&address=CA%2C%20USA&specialty%5B0%5D=Anxiety&s
tting=Virtual&typeOfCare=Talk%20therapy&utm_campaign=160024204010&utm_medium=cpc&utm_source=google&utm_term=grow%

115. Wingify intercepts the following patient communications that the patient enters into the Forms concurrently with the communications being transmitted to Defendant: (1) the therapist's name; (2) the medical insurance carrier; (3) the insurance member identification (ID) number; (4) the type of care the patient is booking an appointment for (talk therapy); and (5) whether the appointment will be virtual or in person. *See* Figure 9.

**Figure 9**



116. Each time Wingify intercepts this activity data, it intercepts a patient's individually identifiable information, including their health insurance member ID number. A patient's insurance member ID number constitutes individually identifiable information because it is a unique identifier of a patient within their insurance carrier's system or the patient's health insurance plan.

117. Further, Twilio intercepts the following patient communications that the patient enters into the Forms concurrently with the communications being transmitted to Defendant: (1) the therapist's name; (2) the medical insurance carrier; (3) the patient's full legal name; (4) the patient's email address; (5) the patient's phone number; (6) whether the appointment will be virtual or in person; and (7) the type of specialty care the patient is seeking care for. *See* Figures 10-11.

**Figure 10**


```
{
    "timestamp": "2024-11-15T17:21:43.848Z",
    "integrations": {},
    "anonymousId": "45e79ad1-ef0f-4cf9-b789-ae4734bed78a",
    "event": "Form Submitted",
    "type": "track",
    "properties": {
        "type": "Patient Booking Attempt",
        "growUniversalId": "45e79ad1-ef0f-4cf9-b789-ae4734bed78a",
        "email":[redacted]@yahoo.com",
        "telephone": "+18[redacted]",
        "state": "CA",
        "first_name": "[redacted]",
        "last_name": "[redacted]",
        "statsigEnvironment": {
            "tier": "production"
        },
        "statsigCustomIDs": ["stableID", "45e79ad1-ef0f-4cf9-b789-ae4734bed78a",
"growUniversalId", "45e79ad1-ef0f-4cf9-b789-ae4734bed78a"],
```

**Figure 11**


```
D1ECA4D9628133335A4E102D39D8DA74F7|629d85ee026a9c25f6262d925ac591fa
        },
        "context": {
                "page": {
                        "path": "/provider/ne448tios9jg/michael-casillas",
                        "referrer":
"https://growtherapy.com/therapists/california/aetna?address=California%2C%20USA&specialty%5B0%5D=Bipolar%20Disorder&setting=Virtual",
                        "search":
"?prsid=ne448tios9jg&insuranceType=Aetna&ref=grow&state=California&setting=Virtual&address=California%2C%20USA&searchId=e14ee6d0-a9db-4966-9252-ccadd8ed78fd&pageNumber=1",
                        "title": "Grow Therapy - Book an Appointment With Michael Casillas"
                        "url":
"https://growtherapy.com/provider/ne448tios9jg/michael-casillas?prsid=ne448tios9jg&insuranceType=Aetna&ref=grow&state=California&setting=Virtual&address=California%2C%20USA&searchId=e14ee6d0-a9db-4966-9252-ccadd8ed78fd&pageNumber=1"
```


118. Each time Twilio intercepts this activity data, it intercepts a patient's individually identifiable information, including their full legal name, email, and phone number. A patient's full legal name directly serves as an identifier. Further, combined with the patient's email address and phone number, this information is sufficient to identify a unique patient.

**H. Plaintiffs' Experiences**

119. Plaintiffs both used Defendant's Website to book therapy appointments. In booking these appointments, Plaintiffs underwent the appointment booking process as described above in paragraphs 59-67 and as shown in Figures 1-11. In booking their therapy appointments, Plaintiffs both communicated with Defendant the state in which they were seeking a therapist, their medical insurance carrier, the specific mental health concern they were seeking therapy for, their health insurance member ID number, their full legal name, their email address, their phone number, and the specific therapist the patient chose to book an appointment with.

120. Datadog, Twilio, and Wingify intercepted Plaintiffs' PII and PHI as shown in the examples above. Plaintiffs never consented, agreed, authorized, or otherwise permitted Defendant to disclose their PII and PHI. Plaintiffs were also never provided with any written notice that Defendant integrated Datadog, Twilio, and Wingify code into its Website that allowed Datadog,

Twilio, and Wingify to intercept their PHI and PII, nor were they provided any means of opting out of such disclosures.

121. By law, Plaintiffs are entitled to privacy in their PHI, PII, and confidential communications. Defendant deprived Plaintiffs of their privacy rights when it: (1) implemented a system that surreptitiously aided third parties, including Datadog, Twilio, and Wingify, in tracking, recording, and intercepting Plaintiffs' and Class Members' confidential communications, PII, and PHI; and (2) undertook this pattern of conduct without notifying Plaintiffs and without obtaining their express written consent. Plaintiffs did not discover that Defendant engaged in the unlawful conduct alleged herein until around October of 2024.

## CLASS ACTION ALLEGATIONS

122. Class Definition: Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and other similarly situated individuals defined as all persons in the United States who, during the class period, had their personally identifiable information or protected health information improperly intercepted by, or otherwise disclosed to, Datadog, Twilio, and/or Wingify, as a result of using the Website (the "Class" or "Nationwide Class").

123. Plaintiffs also seek to represent a subclass consisting of Class Members who, during the class period, had their PII or PHI improperly disclosed to Datadog, Twilio, and/or Wingify, as a result of using the Website while located in California (the "California Subclass" or "Subclass") (the Class and Subclass collectively, the "Classes") (class members and subclass members, collectively "Class Members").

124. Plaintiffs reserve the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

125. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

126. Excluded from the Class and Subclass is Grow Care; any affiliate, parent, or subsidiary of Grow Care; any entity in which Grow Care has a controlling interest; any officer director, or employee of Grow Care; any successor or assign of Grow Care; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

127. Numerosity/Ascertainability. Members of the Class and Subclass are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class and Subclass Members is unknown to Plaintiffs at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class and Subclass. The identity of such membership is readily ascertainable from Grow Care's records and non-party records, such as those of Datadog, Twilio, and Wingify.

128. Typicality. Plaintiffs' claims are typical of the claims of the Class and Subclass because Plaintiffs used the Website and, as a result of Defendant's unlawful conduct, had their PII, PHI, and sensitive communications intercepted by third parties, such as Datadog, Twilio, and Wingify, without Plaintiffs' express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class and Subclass Members.

129. Adequacy. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class and Subclass Members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Class and Subclass. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass.

130. Common Questions of Law and Fact Predominate/Well Defined Community of Interest. Questions of law and fact common to the members of the Class and Subclass predominate over questions that may affect only individual members of the Class and Subclass because Defendant has acted on grounds generally applicable to the Class and Subclass. Such generally

applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

(a) Whether Defendant intentionally tapped the lines of internet communication between patients and their medical providers;

(b) Whether Grow Care's Website contains code that permits third parties, such as Datadog, Twilio, and Wingify, to intercept patients' PII, PHI, and related communications;

(c) Whether Datadog, Twilio, and Wingify are third-party eavesdroppers;

(d) Whether Plaintiffs' and Class Members' communications via the Website and the resultant interceptions thereof constitute an affirmative act of communication;

(e) Whether Grow Care's conduct, which allowed Datadog, Twilio, and Wingify—unauthorized persons—to view Plaintiffs' and Class Members' PII and PHI, resulted in a breach of confidentiality;

(f) Whether Grow Care violated Plaintiffs', Class, and Subclass Members' privacy rights by using third-party technology, such as Datadog, Twilio, and Wingify's code, to allow these third parties to intercept patients' online communications along with information that uniquely identified the patients;

(g) Whether Plaintiffs, Class, and Subclass Members are entitled to damages under the Federal Wiretap Act, CIPA, the CMIA, or any other relevant statute; and

(h) Whether Defendant's actions violate Plaintiffs', Class, and Subclass Members' privacy rights as provided by the California Constitution

131. Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not

practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
**Violation Of The Federal Wiretap Act,**
**18 U.S.C. § 2510, *et seq.***
**(On Behalf Of The Nationwide Class and California Subclass)**

132. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the members of the Classes.

133. The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communications through the use of a device. 18 U.S.C. § 2511.

134. The Wiretap Act protects both the sending and receiving of communications.

135. Among other ways, a violation of the Federal Wiretap Act occurs if a person:

> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; [or]
>
> (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication[.]

18 U.S.C. § 2511

136. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral or electronic communication is intercepted.

137. At relevant times, and without the authorization and consent of Plaintiffs and Class Members, Defendant intentionally procured third parties, including, Datadog, Twilio, and Wingify, to intercept and use Plaintiffs' and Class Members' internet communications in transit while Plaintiffs and Class Members accessed the Website.

138. Defendant, when aiding and assisting the interception and use of Plaintiffs' and Class Members' internet communications by the above-described third parties, including Datadog, Twilio, and Wingify, intended to help those third parties learn the substance, purport and meaning

of the content of those communications, including the content in the visited URLs and the content of the information provided by Plaintiffs and Class Members via the Website.

139. The following items constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The computer codes and programs Datadog, Twilio, and Wingify used to track Plaintiffs' and Class Members' communications while they were navigating the Website;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' computing and mobile devices;

d. Datadog's, Twilio's, and Wingify's web and ad-servers;

e. The web and ad-servers from which Datadog, Twilio, and Wingify tracked and intercepted Plaintiffs' and Class Members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Datadog, Twilio, and Wingify to effectuate their tracking and interception of Plaintiffs' and Class Members' communications while they were using a browser to visit Defendant's Website; and

g. The plan Datadog, Twilio, and Wingify carried out to effectuate their tracking and interception of the Plaintiffs' and Class Members' communications while they were using a web browser to visit Defendant's Website.

140. The patient communication information that Defendant permitted Datadog, Twilio, and Wingify to intercept via Defendant's integration of the Datadog, Twilio, and Wingify code on the Website—including: (1) therapists' names; (2) insurance carriers; (3) insurance member ID numbers; (4) the type of care for which patients booked appointments (*e.g.*, talk therapy); (5) the type of specialty care for which patients sought care; (6) whether appointments would be virtual or in person; (7) patients' full legal names; (8) patients' email addresses; and (9) patients' phone numbers—constitutes the contents of electronic communication because it includes detailed URL

requests and form field entries that contain information Plaintiffs and the Classes actively inputted into the Website.

141. The transmissions described above were "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetics, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

142. Datadog, Twilio, and Wingify were not authorized parties to the communications between Plaintiffs and Class Members, on the one hand, and Defendant, on the other, because Plaintiffs and Class Members did not know that these third parties were surreptitiously intercepting the data at issue and did not knowingly send any communications to Datadog, Twilio, or Wingify.

143. Plaintiffs and the Classes did not consent to Defendant's conduct of procuring Datadog, Twilio, and Wingify to intercept their confidential communications.

144. Defendant intentionally procured third parties, including Datadog, Twilio and Wingify, to intercept, endeavor to intercept, use and endeavor to use the contents of Plaintiffs' and Class Members' communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, violation of the CIPA, and violation of the CMIA, among others.

145. Defendant was not acting under color of law in procuring third parties, including Datadog, Twilio and Wingify, to intercept, endeavor to intercept, use and endeavor to use the contents of Plaintiffs' and Class Members' communications.

146. As demonstrated hereinabove, Defendant violated the Federal Wiretap Act by in procuring third parties, including Datadog, Twilio and Wingify, to intercept, endeavor to intercept, use and endeavor to use the contents of Plaintiffs' and Class Members' sensitive online communications, in transit, through its Website, without their consent.

147. After intercepting the communications, Datadog, Twilio, and Wingify used the contents of the communications to provide Defendant with advertising, analytics, and marketing services.

148. As a result of the above actions, Plaintiffs and Class Members have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such, Plaintiffs and Class Members are entitled to: (i) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and any profits made by Defendant as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (ii) appropriate equitable or declaratory relief; and (iii) reasonable attorneys' fees and other costs reasonably incurred.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf Of The Nationwide Class and California Subclass)**

149. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the members of the Classes.

150. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications … " Cal. Penal Code § 630.

151. A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained …

Cal. Penal Code § 631(a).

152. Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

153. To avoid liability under § 631(a), a defendant must show it had the consent of all parties to a communication.

154. At all relevant times, Defendant aided, agreed with, and conspired with third parties, including, Datadog, Twilio, and Wingify, to track and intercept Plaintiffs' and Class Members' internet communications in transit while Plaintiffs and Class Members accessed the Website. These communications were intercepted without the authorization and consent of Plaintiffs and Class Members.

155. Defendant, when aiding and assisting the wiretapping by the above-described third parties, including Datadog, Twilio, and Wingify, intended to help those third parties learn some meaning of the content in the URLs and the content the visitor requested.

156. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Datadog, Twilio, and Wingify code fall under the broad catch-all category of "any other manner":

a. The computer codes and programs Datadog, Twilio, and Wingify used to track Plaintiffs and Class Members' communications while they were navigating the Website;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' computing and mobile devices;

d. Datadog, Twilio, and Wingify's web and ad-servers;

e. The web and ad-servers from which Datadog, Twilio, and Wingify tracked and intercepted Plaintiffs' and Class Members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Datadog, Twilio, and Wingify to effectuate its tracking and interception of Plaintiffs' and Class Members' communications while they were using a browser to visit Defendant's Website; and

g. The plan Datadog, Twilio, and Wingify carried out to effectuate their tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to visit Defendant's Website.

157. The patient communication information that Defendant permitted Datadog, Twilio, and Wingify to intercept via Defendant's integration of the Datadog, Twilio, and Wingify code on the Website—including: (1) therapists' names; (2) insurance carriers; (3) insurance member ID numbers; (4) the type of care for which patients booked appointments (*e.g.*, talk therapy); (5) the type of specialty care for which patients sought care; (6) whether appointments would be virtual or in person; (7) patients' full legal names; (8) patients' email addresses; and (9) patient's phone numbers—constitutes the contents of communication because it is information Plaintiff and Class Members actively inputted into the Website that "divulge a user's personal interests, queries, and habits." *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 605 (9th Cir. 2020).

158. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to intercept Plaintiffs' and Class Members' sensitive online communications, in transit, through its Website, without their consent.

159. As a result of the above violations, Defendant is liable to Plaintiffs and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

160. Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

**COUNT III**
**Violation of the California Confidentiality of Medical Information Act**
**Cal. Civ. Code § 56.10**
**(On Behalf Of The California Subclass)**

161. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Subclass.

162. Under the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10 ("CMIA"), providers of health care are prohibited from disclosing medical information relating to their patients, without a patient's authorization. Medical information refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care ... regarding a patient's medical history, mental or physical condition, or treatment. "Individually Identifiable" means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual … "

163. The CMIA § 56.06(a) defines a provider of health care as "[a]ny business organized for the purpose of maintaining medical information in order to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage the individual's information, or for the diagnosis and treatment of the individual."

164. Plaintiffs and Subclass Members are patients under the definition of the CMIA because Plaintiffs and Subclass Members received "health care services from a provider of health care" and the information Defendant shared to Wingify and Twilio was "medical information pertain[ing]" to Plaintiffs and Subclass Members. Cal. Civ. Code § 56.05(m).

165. Defendant is a provider of health care under Cal. Civ. Code § 56.06(a) because it is an organization designed to provide patients with access to mental health care and provides a platform from which patients can manage their mental health treatment and where therapists can manage their patients' mental health treatment. Because Defendant is deemed a provider of health

care, it has an ongoing obligation to comply with the CMIA's requirements regarding the maintenance of its user's medical information.

166. As set forth hereinabove, a health insurance member ID is an identifier sufficient to allow identification of an individual because it is a unique number meant to identify an insured person within a health insurance plan. A patient's full legal name is also an identifier sufficient to allow identification of an individual because it is a person's primary identification mechanism across all settings. A patient's email address and phone number are also identifiers sufficient to allow identification of an individual because they are unique pieces of information associated with a particular person. Along with patients' health insurance member ID, full legal name, email, and phone number, Grow Care disclosed to Wingify and Twilio several pieces of information regarding its patients' use of its Website, which, on information and belief, included, but is not limited to: (1) therapists' names; (2) insurance carriers; (3) insurance member ID numbers; (4) the type of care for which patients booked appointments (*e.g.*, talk therapy); (5) the type of specialty care for which patients sought care; (6) whether appointments would be virtual or in person.

167. This patient information is derived from a provider of health care regarding patients' mental health treatment. Accordingly, it constitutes medical information pursuant to the CMIA.

168. Defendant fails to obtain its patients' authorization for the disclosure of medical information to Wingify and Twilio in the manner prescribed pursuant to CMIA § 56.11.

169. CMIA § 56.11 requires that a valid authorization for disclosure of medical information must be: (1) "Clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization"; (2) be signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Accordingly, Grow Care does not provide patients with any opportunity to provide such valid authorization.

170. Based on the above, Defendant violated the CMIA by disclosing its Plaintiffs' and Class Members' medical information to Wingify and Twilio along with their health insurance ID

numbers, full legal name, email address, and phone number, while failing to obtain their valid authorization for the disclosure of medical information.

171. Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars and attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information. Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information.

**COUNT IV**
**Invasion Privacy Under California's Constitution**
**(On Behalf of The Nationwide Class and California Subclass)**

172. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class and Subclass.

173. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications about their mental health conditions and treatment; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiffs' and Class Members' knowledge or consent.

174. At all relevant times, by installing and embedding Datadog, Twilio, and Wingify code into the Website so that these third parties could intercept users' private communications with Defendant regarding their mental health conditions and treatment, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution by disclosing their private information.

175. Plaintiffs and Class Members had a reasonable expectation that their communications about their mental health conditions and treatment, and other private information, would remain confidential and that Defendant would not enable third parties' interception of this sensitive information given that Defendant did not provide Plaintiffs and Class Members with notice of its practice of disclosures.

176. Plaintiffs and Class Members did not authorize Defendant to record and transmit Plaintiffs' and Class Members' private medical communications alongside their personally identifiable health information.

177. This invasion of privacy is highly offensive and serious in nature, scope, and impact because it relates to patients' private mental health condition and treatment communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

178. Accordingly, Plaintiffs and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

**COUNT V**
**Intrusion Upon Seclusion**
**(On Behalf Of The Nationwide Class and California Subclass)**

179. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class and Subclass.

180. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications about their mental health conditions and treatment; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiffs' and Class Members' knowledge or consent.

181. At all relevant times, by installing and embedding Datadog, Twilio, and Wingify code into the Website so that these third parties could intercept users' private communications with Defendant regarding their mental health conditions and treatment, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights by intruding into their private place, conversation or matter. Defendant's actions amount to an intrusion upon Plaintiffs' and Class Members' privacy because Plaintiffs and Class Members did not consent to the particular conduct that Defendant engaged in—allowing Datadog, Twilio, and Wingify to intercept their sensitive conversations related to their mental health concerns and treatment.

182. Plaintiffs and Class Members had a reasonable expectation that their communications about their mental health conditions and treatment, and other private information, would remain confidential and that Defendant would not enable third parties' interception of this sensitive information given that Defendant did not provide Plaintiffs and Class Members with notice of its practice of disclosures.

183. Plaintiffs and Class Members did not authorize Defendant to record and transmit Plaintiffs' and Class Members' private medical communications alongside their personally identifiable health information.

184. This invasion of privacy is highly offensive and serious in nature, scope, and impact because it relates to patients' private mental health condition and treatment communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

185. Accordingly, Plaintiffs and Class Members seek all relief available for Defendant's intrusion upon their seclusion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a. For a determination that this action is a proper class action;

b. For an order certifying the Class and Subclass, naming Plaintiffs as representative of the Class and Subclass, and naming Plaintiffs' attorneys as Class Counsel to represent the Class and Subclass;

c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiffs, the Class, and the Subclass on all counts asserted herein;

e. For an award of compensatory damages, including statutory damages where available, to Plaintiffs, Class, and Subclass Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f. For punitive damages, as warranted, in an amount to be determined at trial;

g. For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief as pleaded or as the Court may deem proper;

j. For an order awarding Plaintiffs, the Class, and the Subclass their reasonable attorneys' fees and expenses and costs of suit; and

k. For an order granting Plaintiffs, Class, and Subclass Members such further relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the proposed Class and Subclass, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: March 5, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*
Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: idiaz@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)

6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-mail: scott@drurylegal.com

*Attorneys for Plaintiffs and the Putative Class*